## NOBLES *v.* THE STATE.

| 98 | 73 |
| 113 | 740 |

| 98 | 73 |
| 118 | 802 |

| 98 | 73 |
| 120 | 294 |

1. Whether or not the grounds relied upon as extraordinary in an application for a new trial in a criminal case are in law sufficient as such extraordinary grounds to require the consideration of a motion for a new trial based thereon, if the trial judge nevertheless takes cognizance thereof and overrules a motion to dismiss such a motion for a new trial, made upon the ground that the grounds relied upon as extraordinary are not in law sufficient, and afterwards hears and overrules the motion itself upon its merits, this court will treat the motion for a new trial so made as though it had been originally made in due time, and in its judgment will review all questions of law made on the trial and presented by the record here.

2. Where in an indictment for murder the homicide is alleged to have been committed in pursuance of a conspiracy entered into among several persons, all of whom are alleged to have been principals in the first degree, a conviction of one or more of the defendants, if otherwise legal, will be upheld, notwithstanding the acquittal of one or more of the persons jointly indicted.

3. Where several persons are being jointly tried, and confessions of each are offered in evidence, a charge of the trial judge:  "I further charge you, should you find from the evidence that any one or more of the defendants made confessions, such confession would only apply to the one making it, and would not inculpate or implicate any other one of them so far as that particular confession is concerned," is a sufficient caution to the jury not to consider the confession of one as bearing upon the guilt or innocence of the others.

4. Where upon the subject of confessions the charge of the court is in all other respects full and fair, a mere failure to charge that they should be received with caution and scanned with care, will not, in the absence of a request to charge to that effect, be sufficient to justify the grant of a new trial.

5. Where a person suspected of complicity in the commission of a criminal offense, voluntarily inquires of another as to the probable result of the cause in the event a confession is made, and the person interrogated truthfully states that in his opinion a

conviction would follow, and that such conviction would result either in the death penalty, or a sentence to life imprisonment, and that a confession might result in the latter punishment, such statement does not render a confession then made inadmissible as having been obtained by improper or illegal means.

6. Taking the evidence *pro* and *con* bearing upon the subject of the alleged insanity of the accused as offered at the hearing of the motion, and treating that offered by the movant as having been newly discovered, thus placing it in its most favorable light, it was wholly insufficient, when considered in the light of the evidence offered in rebuttal by the State, to authorize, much less require, the grant of a new trial, and the discretion of the court in refusing to grant a new trial upon such evidence was properly exercised.

7. The evidence fully warranted the verdict, and there was no charge, omission to charge, or error of any kind, which would warrant a reversal of the judgment below.

January 13, 1896.

Indictment for murder. Before Judge Smith. Twiggs superior court. October term, 1895.

The indictment contained two counts. The first charged Gus Fambles, Elizabeth Nobles, Mary S. Fambles, Debby Nobles and Dalton Joyner as principals in the first degree, for that they conspired to murder and did murder William Nobles by striking him with a hatchet which they held. The second charged the same parties with being present aiding and abetting Gus Fambles to commit the murder in manner and form aforesaid. At a special term held on July 9-11, 1895, the defendants were tried, and Gus Fambles, Elizabeth Nobles and Mary S. Fambles were found guilty, with recommendation of life imprisonment as to Mary S. Fambles. Debby Nobles and Dalton Joyner were acquitted. The convictions were based on free and voluntary confessions of the three convicted, strongly corroborated by numerous circumstances. It was ascertained on the evening of Sunday, June 23, 1895, that William Nobles had disappeared from his home and had not been seen for two days. On the next day (Monday) search for him was made, and in the after-

noon his dead body was found buried in the ground about a quarter of a mile from his dwelling-house. Three wounds appeared on his head, one of which certainly, and possibly either of the others also, would have caused death. Although it had rained in the meantime, blood was found on the ground and on a fence over which, according to the confessions, he was carried from the place of the murder to the spot where he was buried. The confessions were made during the same day, and were substantially to the effect that Gus Fambles did the actual killing, with a hatchet sent to him by Elizabeth Nobles (wife of deceased) by the hand of Mary S. Fambles (wife of Gus Fambles), in consideration of ten dollars paid to him by Mrs. Nobles, with the promise of more to be paid; that upon the return of the deceased from his work in the evening of Friday, June 21, 1895, he was told by Mrs. Nobles that some one was stealing corn from his crib, and directed by her to go to the crib and watch for the thief while she went into the house to get his gun for him, she having previously caused some corn to be so scattered as to lead to the belief that the crib had been robbed, and it was while he was behind the crib in a stooping position that he was struck and killed; and that she had made two efforts to have him thus put out of the way (the matter having been discussed between her and Fambles and wife for about two months), her avowed motive being that he worked their children very hard and treated them roughly, would not provide sufficient clothing, etc., and she wanted to see peace and pleasure. In Fambles' confession he claimed that of the three blows struck one was by Mrs. Nobles.

No motion was made by counsel who represented the defendants at the trial, but at the next regular term, a motion to set aside the judgment and an extraordinary motion for new trial, made on behalf of Mrs. Nobles, were filed under order of the court. Upon the hearing the solicitor-

general moved to dismiss the motion for a new trial, which motion was overruled. Both the motion to set aside the judgment and the motion for new trial were overruled, and defendant excepted. The grounds for these motions, so far as material to this report, are sufficiently apparent from the opinion.

*Marion Harris* and *Glenn & Rountree*, for plaintiff in error. *J. M. Terrell, attorney-general, Tom Eason, solicitor-general,* and *John M. Stubbs,* contra.

ATKINSON, Justice.

1. The plaintiff in error, having been convicted of the offense of murder, made a motion for a new trial upon extraordinary grounds, which the circuit judge entertained, and upon which he granted a rule *nisi* requiring the solicitor-general, who prosecutes for the State, to show cause why a new trial should not be granted. At the hearing a motion was made to dismiss the motion for a new trial, upon the ground that the reasons urged to sustain it were insufficient in law to authorize the court to assume jurisdiction and entertain it. This motion was overruled, and the motion for a new trial, being considered upon its merits, was itself overruled. In this court counsel for the State sought to raise again the question of the insufficiency of the grounds stated to authorize the circuit judge to entertain and determine the motion for new trial, suggesting that inasmuch as the court had no jurisidiction to entertain the motion, no error thereafter committed in overruling it could be considered upon writ of error. We do not think this contention well founded. It will be borne in mind that the present is a criminal case, and that a ruling made by a circuit judge adverse to the State, even if otherwise subject to meritorious objection, cannot be reviewed upon writ of error; and this is true even if exceptions *pendente lite* to the ruling complained of had been taken by counsel for the State, which was not done in the present case, and could not

be done in any criminal case. The State, not being entitled to prosecute directly a writ of error for the reversal of such a ruling, is not entitled by indirection to call again in question a ruling thus made against the defendant in the court below. We therefore dismiss the technical question made in this case, with the observation that inasmuch as the circuit judge entertained the motion and determined the questions made upon their merits, this court will not inquire whether the grounds upon which he entertained the motion made upon alleged extraordinary grounds were or were not sufficient in law, but will treat the motion as in all respects regular, and review upon their merits the several rulings alleged as error in the grounds of the motion.

2. We do not think the court erred in overruling the defendant's motion to set aside the judgment upon either of the grounds of the motion made for that purpose. The plaintiff in error, jointly with four others, was charged in one count of the indictment as a principal in the first degree, and in the second count was charged as a principal in the second degree. The jury found against her a general verdict of guilty, and the effect of this verdict was to convict her as a principal, whether in the first or second degree is immaterial. The offense of murder in both degrees is punishable alike in this State. See Leonard v. The State, 77 Ga. 764; Collins v. The State, 88 Ga. 347, and authorities there cited. They involve the rendition of the same judgment, are carried into execution in the same manner; and hence, whatever difference of opinion may have heretofore existed as to whether the evidence necessary to support a conviction under an indictment charging one as principal in the first degree will support a conviction of one as principal in the second degree, such differences are now definitely resolved by the judgment of this court rendered in the case last above cited, wherein the present Chief Justice, then Associate Justice Simmons, in delivering the opinion of the court, pronounces as follows: "There is no difference in

this State between the punishment of a principal in the first degree and that of a principal in the second degree, and where this is true, it seems now to be well settled that there is no practical or material difference between principals of the two degrees, and a principal in the second degree may be convicted on an indictment charging him as a principal in the first degree; in other words, an indictment charging one as principal in the first degree is supported by evidence showing him to be a principal in the second degree." Such being the law of this State, it is unnecessary and unprofitable to inquire upon which count of the indictment the sentence is to be pronounced; it is the same in either; the grade of the offense is the same, and if the conviction under the evidence can be upheld on either, there is no reason why the verdict is not a legal one. Indeed, that precise question was ruled by this court in the case of the *State* v. *Dohme*, 68 *Ga.* 339. So, too, it can make no difference that some of the jointly indicted defendants were acquitted and some convicted. Under the provisions of our Penal Code, §969, this may occur without affecting the legal status of those convicted. See *Rachels* v. *The State*, 51 *Ga.* 374. While the indictment in the present case alleges a conspiracy between the defendants in the execution of a common purpose to murder the deceased, it is not an indictment for the technical offense of conspiracy, which involved at common law proof not only of the illegal act, but the unity of purpose between the conspirators. In that case the conspiracy was of the gist of the offense, the illegal act only an incident which served to characterize the conspiracy. Hence, it was held that if the proof of the conspiracy failed as laid, the accused must be acquitted. The provision of our code above referred to eliminates however that difficulty, even if in cases like the present the doctrine could ever have had application. It will be observed that the distinction between the present and cases like those above referred to lies in the fact that in such cases the conspiracy

was made by statute the central incriminating fact, the ultimate result—the homicide—the incident; while in the present case the homicide constituted the breach of the public law, and the conspiracy was only incidentally the means by which the violation of the law was accomplished. It could have been as well accomplished by the .commission of the homicide by one person alone, .as by that person acting in conjunction with many; and hence the proof of the conspiracy, the conspiracy itself not being á substantive part of the offense, was not necessary to a conviction of those persons who were shown to have participated in both the criminal design and the criminal act. Thus we are led to conclude that the court committed no error in overruling the motion which was made to set aside the judgment.

3. The plaintiff in error, having been jointly indicted, elected to be tried jointly with several others. It occurred that upon the trial the State's counsel saw proper to introduce confessions separately made by each of the several defendants, and it was objected that the court in its charge so confused the instructions to the jury as to make the confessions made by each of the several defendants bear against the other, thus practically admitting as evidence against each other the sayings of the alleged conspirators made after the termination of the joint enterprise. We do not think that this criticism of the charge of the court is borne out by the record. We find, by reference to the charge of the court as it is certified to us, this instruction: "I further· charge you, should you find from the evidence that any one or more of the defendants made. confessions, such confession would apply only to the one making it, and would· not inculpate or implicate any other one of them so far as that particular confession is concerned." Such an instruction was a direction to the jury, that in passing upon rights of each of the several defendants, any confession admitted should be considered only as affecting the interest of the person who made it; and under such an instruction it seems

inconceivable that a jury should have imputed to the plain-
tiff in error any degree of responsibility resting upon the
sayings of her confederates.

4. Exception is taken to the failure of the court, while
instructing the jury upon the subject of confessions, to
charge that "confessions are to be received with caution and
scanned with care." While it would have been the better
practice for the judge to have so specially charged, upon
reading the charge of the court we find that the judge in-
structed the jury with great fullness and fairness, not only
as to the circumstances under which confessions of guilt
were admitted in evidence and under which they were
entitled to give credit to such confessions, but likewise as
to their weight and the degree of corroboration necessary
to support a conviction resting upon them. · Such instruc-
tions necessarily involve the idea that they are received
with caution and are to be scanned with care. No man could
listen to such an instruction—could be told that confessions
must be freely and voluntarily made, uninfluenced by fear
or hope of reward, and that when received, were, even if
they admitted the guilt of the confessor, not sufficient to
convict unless corroborated—and doubt that in receiving
and acting upon them he should exercise great caution.
The idea of caution is the dominant thought running
through such general instructions; and hence we conclude
that if an instruction more particular and in the exact lan-
guage of the law is desired, it should have been specially
requested in the manner pointed out by law.

5. We think the confessions admitted against the accused
were properly allowed to go to the jury. It appears that
the plaintiff in error, having been suspected and accused of ·
complicity in the homicide of her husband, asked the officer
having her in custody what would likely be the result if she
made a confession, and that in reply to this question, she was
informed that if she confessed she would either be hung or
sentenced to the penitentiary for life. Thereupon she

made the confession upon which she was subsequently convicted. We do not find in this advice, given in response to a direct inquiry by the accused, any evidence whatever that the confession was not freely and voluntarily made; nor any evidence that it was otherwise improperly obtained. The officer spoke truthfully when he stated what would likely be the result. No false hope was held out to induce her to speak. She was not misled in any way, and spoke with a full consciousness of the consequences which would probably result; and we therefore conclude that the exception to the ruling of the presiding judge in admitting the confession in question upon the ground that it was not freely and voluntarily made, is without merit.

6. In dealing with the evidence submitted by counsel for the plaintiff in error upon the subject of insanity, we treat the same, as it was treated by the trial judge, as newly discovered; and so treating it, a careful review of all the evidence submitted upon the part of the accused, and a comparison of that with the evidence submitted upon the part of the State, leaves not the trace of doubt upon the mind of this court that the defense sought to be set up thereby is wholly imaginative and utterly without merit. A considerable portion of the evidence submitted for the accused, and that which seems at first glance to be most direct and credible, upon examination appears to have been fabricated. An illustration of this is to be found in the fact that on the fifth day of October, 1895, one Nancy Landfair made an affidavit upon the general subject of the mental condition of the accused, and stated, with great minuteness of detail, facts bearing upon the mental condition of her ancestors, and which, if true, might have borne out to some extent the theory of the insanity of the accused. This affidavit was subscribed before one Hendricks, a justice of the peace; and yet the same witness, on the 26th of the same month, makes an affidavit in which she utterly repudiates the sworn statement attributed to her, and states that she was fraudu-

lently induced by the said Hendricks to make the same, she being at the time ignorant of its contents.   The witness, Dykes, whose affidavit is full of personal reminiscence touching the ancient history of the family of the accused, is discredited by the fact that his family physician and others who knew him intimately testify that at the time he made the affidavit attributed to him he was of an extreme old age, feeble in health and body, and his mind and memory so greatly impaired by age and disease, that it is improbable he would understand the force of what he undertook to say.   The same was true of the witness Stokes, who made an affidavit similar to that made by the witness Dykes, and who was in like manner discredited.   The other testimony chiefly relied upon by the accused was evidence of hereditary insanity, consisting of extracts from records of the insane asylum showing the commitment of her mother to that institution, and testimony of witnesses who deposed that a number of the members of the family had been and were of weak mind.   In addition to this was the testimony of alleged experts upon insanity, including physicians who do not appear to have given to the subject of insanity any special study.   Newspaper reporters, jailors, and the like, who, without professing to know anything of the antecedents of the special subject under investigation, ventured upon general principles to enlighten the court by expressing an opinion that the accused was of unsound mind. Many reasons were assigned for these opinions.   In one case the witness thought the subject too narrow between the eyes, and in another that her brow was too low to be a person of much intelligence.   Another attributed his opinion to the worn and haggard appearance of the accused—a most natural circumstance when it is considered that she had just been tried and was then under sentence of death for the homicide of her husband.   Opposed to this expert testimony was the testimony of the physician who had for

years attended upon the family of the accused, herself among the number, and he testified that she was above the average of her class in point of intelligence, and that he had never observed the slightest circumstance in her demeanor or conversation which would indicate a weakness of mind. Numbers of her neighbors testified that they had known her for years, and that she was above the average in point of intelligence. The merchants with whom she traded were of one opinion, that she was a keen, shrewd woman, and knew how to protect her rights in a trade as well as any one. We conclude that there is no merit in the contention that the accused was of unsound mind, either at the time of the commission of the homicide, at the time of the trial or at the time the motion for new trial was heard. The testimony upon the subject of her insanity, if introduced upon the trial, ought not in law to have produced a different result. If the verdict was right without such evidence, it would be none the less right with it in the record; and we are therefore not disposed to overrule the circuit judge in denying a new trial upon that ground.

7. A verdict of guilty was the only one which under the facts of the present case could have been lawfully rendered. To have reached any other conclusion a jury must have closed its eyes to the law, its ears to the evidence, and its conscience to the appeals of justice and truth. A more cunning or remorseless scheme for the commission of a cold-blooded murder was never conceived or carried into execution. That a woman who, so far as the evidence shows, could have no cause of complaint against her husband, should calmly and deliberately plan his assassination, and await for months a favorable occasion for carrying into execution her murderous design, seems almost inconceivable. The circumstances of the killing do not indicate the action of a weak mind; there is nothing in the perfection of detail with which the plan of assassination was conceived or exe-

cuted, to suggest a want of mental capacity. On the contrary, the bargain driven with the actual murderer, the cunning device by which the victim was lured to the place selected for the homicide, the precautions taken against discovery,—these things indicate, not mental imbecility, but moral degeneracy of the most ultra type; what the law would term an abandoned and malignant heart. Upon the evidence the law fixed inexorably the verdict of guilty. A jury could not have found otherwise without violence to their oaths and to the law, but the penalty was in a measure in their discretion. They saw proper not to recommend the lesser penalty, and in that matter the trial judge did not and should not have controlled their finding. There was no sentiment to which the voice of mercy and humanity could have appealed which had not been destroyed by the brutal ferocity of the accused and her partners in crime, and it is not unnatural that a jury should leave sentiment out of consideration when there was nothing to appeal to their tenderer sensibilities. We are not disposed to discuss with greater detail the circumstances which surrounded the commission of this homicide. Suffice it here that the verdict was right, and the trial judge properly refused a new trial.

*Judgment affirmed.*